GREAT NORTHERN RAILWAY COM-
PANY, a Minnesota Corporation,
Plaintiff,

v.

Richard J. THOMPSON, Bruce Hagen,
and Ben J. Wolf, Commissioners of
the North Dakota Public Service Com-
mission, Harold T. Upgren, Director,
Motor Carrier Division, North Dakota
Public Service Commission, and Ralph
Wood, Superintendent, North Dakota
State Highway Patrol, Defendants.

Civ. No. 545.

United States District Court
D. North Dakota,
Southwestern Division.

Oct. 21, 1963.

**574**

Frank J. Magill, of Nilles, Oehlert & Nilles, Fargo, N. D., and Elmer B. Trousdale, St. Paul, Minn., for plaintiff.

Gerald G. Glaser, Sp. Asst. Atty. Gen., and John Stewart, Asst. Atty. Gen., Bismarck, N. D., for defendants.

Before VOGEL, Circuit Judge, and REGISTER and BECK, District Judges.

REGISTER, District Judge.

This action was brought to enjoin the enforcement by defendants against plaintiff of specific North Dakota statutes requiring certificates of public convenience and necessity of common carriers by motor vehicles engaged in North Dakota intrastate commerce, insofar as the transportation of specific items by plaintiff from its railheads in north central North Dakota to designated ballistic missile sites in that area is concerned. The complaint, filed on June 25, 1963, prayed for an order convoking a three-judge court pursuant to the provisions of 28 U.S. C.A. § 2284, a temporary injunction and a permanent injunction. Plaintiff's application for temporary injunction was presented to District Judge Register on said date and, upon due consideration was, on the same day, issued.

Subsequently, by order of the Chief Judge of this Circuit, this Court was designated to hear and determine the proceedings herein.

On July 5, 1963, defendants filed their motion to dismiss the complaint upon the ground "the court has no jurisdiction of the subject matter and that the complaint fails to state a claim upon which relief can be granted". On August 1, plaintiff filed its amended complaint (which document was filed pursuant to stipulation of the parties, and which stipulation provided that defendants' prior motion to dismiss could be considered interposed as the responsive pleading to the amended complaint).

On August 27 hearing was had at Fargo, North Dakota, at which time arguments were heard first on defendants' motion to dismiss. After taking said motion under advisement, this Court proceeded to hear all matters in issue. Counsel stipulated as to certain evidence on the merits; plaintiff presented evidence on the merits; testimony of witnesses was presented by direct and cross-examination; and, after counsel had rested their respective cases, they presented

argument and the case was submitted and taken under advisement.

During argument on the motion to dismiss, counsel for defendants stipulated that, for the sole purpose of such motion, the transportation here involved was interstate commerce.

Also, at the time of such hearing, plaintiff moved to amend the temporary restraining order (which by its own terms expired on the date of said hearing) so that the same be effective until the final determination of this action; counsel for defendants stipulated to the preparation and filing of such amended temporary restraining order. By order, we granted such motion, and an amended temporary restraining order was duly filed on September 13, 1963.

Counsel for both sides have thoroughly and ably briefed the issues here involved.

The Court now being fully advised in all the premises, makes and enters the following findings of fact, memorandum, conclusions of law, and order for judgment.

### Findings of Fact

1. Plaintiff, a Minnesota corporation, is a common carrier by railroad engaged in intrastate and interstate commerce. It operates a line of railroad from Sioux City, Iowa, and St. Paul, Minnesota (where it connects with other rail carriers operating south and east thereof), to the points of Minot, Kenaston, Palermo and Mohall, North Dakota, among others.

2. The defendants, Richard J. Thompson, Bruce Hagen and Ben J. Wolf are the duly elected or appointed commissioners of the North Dakota Public Service Commission with offices in the North Dakota State Capitol Building, Bismarck, North Dakota. The defendant Harold T. Upgren is presently the duly appointed director of the motor carrier division of the said North Dakota Public Service Commission, State Capitol Building, Bismarck, North Dakota. The defendant Ralph Wood is Superintendent of the North Dakota State Highway Patrol, State Capitol Building, Bismarck, North Dakota.

3. Chapter 49–18 of the North Dakota Century Code contains, generally, the law relating to the supervision and regulation of motor carriers in the state of North Dakota.

Section 49–18–07, N.D.C.C., provides that:

"It shall be unlawful for any common motor carrier, contract motor carrier, or agricultural carrier to transport persons or property for hire unless:

"1. He shall have obtained the certificate or permit required by this chapter; and

"2. He shall comply with the provisions of this chapter and with any applicable rules, regulations, or restrictions adopted by the commission."

Section 49–18–08 provides in part that, "The commission shall supervise and regulate all common motor carriers of property or passengers as defined in section 49–18–01 * * *", and said commission is granted broad and general powers in connection therewith.

Section 49–18–44 provides that:

"No common motor carrier shall operate within this state without first having obtained from the commission a certificate of public convenience and necessity. Application therefor shall be made upon forms to be prescribed by the commission. The commission shall make regulations for the filing of such application. The application must contain a financial statement, a list of equipment to be used, a description of the type of service offered, and the route and territory to be served. However, upon receipt of such an application and when there is an immediate and urgent need the commission shall have the authority to grant a temporary permit for service by a common motor carrier to a specified point or points or within a specified territory having no carrier service capable of meeting such need. Such

temporary permit shall be granted without a hearing and, unless suspended or revoked for good cause, shall be valid for such time as the commission shall specify but for not more than an aggregate of one hundred and eighty days, and shall create no presumption that the corresponding certificate of public convenience and necessity shall be granted after the hearing on the application. Such temporary permit shall be transferable only after notice to all interested parties and approval by the commission, after opportunity for hearing."

Section 49–18–44 provides that:

"Every office agent and employee of any corporation, person, or co-partnership, and every other person, who violates, fails to comply with, or who procures, aids, or abets in the violation of any provision of this chapter, or who fails to obey, observe, or comply with any of the rules or regulations, or of any part or provision thereof, is guilty of a misdemeanor and shall be punished by a fine of not more than one hundred dollars, or by imprisonment in the county jail for not more than thirty days, or by both such fine and imprisonment."

Section 49–18–45 provides in part that, "The highway patrol shall enforce the provisions of this chapter in any part of the state", and "The commission, together with its officers and employees and the highway patrol, shall assist in the enforcement of this chapter and shall institute, or cause to be instituted, prosecutions for the violation of any of the provisions hereof."

As heretofore stated, this suit was brought to enjoin the enforcement by defendants against the plaintiff of the above quoted statutes.

4. On January 16, 1962, plaintiff filed an application with the Interstate Commerce Commission under Section 210a (a) of the Interstate Commerce Act, 49 U.S.C.A. § 310a(a), for temporary authority to conduct operations as a common carrier by motor vehicle from its railheads in the area of Minot, North Dakota, to 150 missile sites and 15 launch control centers comprising the Minot, North Dakota, Minuteman Missile Complex. Said application covered all contractors' equipment, material and supplies to be used in the construction of that missile base but was limited to motor carrier service which was auxiliary to and supplementary of the rail service of the plaintiff, and to the handling of traffic having a prior or subsequent movement by rail to or from points outside of North Dakota. Effective February 6, 1962, this temporary authority was granted by the Interstate Commerce Commission in I.C.C. Docket MC 28573 sub 19TA. Plaintiff thereafter began operations under that authority, transporting shipments to the missile sites by motor vehicle from certain of its North Dakota railheads, which shipments it had transported to those North Dakota railheads from points outside the state via its railroad.

5. On December 5, 1962, the Interstate Commerce Commission denied plaintiff's application for permanent authority to conduct the motor carrier operations specified in paragraph 4 above and on April 26, 1963, denied plaintiff's petition for rehearing and reconsideration of that decision. Great Northern Ry. Co. Extension, Minot, North Dakota Ballistic Missile Sites, MC 28573 sub 17. Plaintiff's temporary authority granted February 6, 1962, expired by force of other Interstate Commerce Commission orders on or about May 16, 1963.

6. On May 20, 1963, plaintiff filed an application with the Interstate Commerce Commission for 30-day emergency temporary motor carrier authority for the same service specified above, on the ground, among others, that large quantities of missile site traffic had accumulated at its railheads of Palermo and Kenaston, North Dakota (particularly large amounts of cable used in the missile site communication system), and that unless new authority was issued there was no motor carrier service ready

and available to handle those shipments. This 30-day authority was granted by the Interstate Commerce Commission effective May 23, 1963, in its order in Great Northern Railway Co., MC 28573, R–2, and was due to expire on June 22, 1963.

7. By a second order effective June 22, 1963, this authority was extended by the Interstate Commerce Commission for an additional 30 days beginning with June 22, 1963. Plaintiff also has pending with the Interstate Commerce Commission an application for temporary authority for an additional 150 days of service as well as a second application for permanent authority for the same service.

8. On or about May 27, 1963, at Minot, North Dakota, the defendant Harold T. Upgren, on the oral complaint of one Maas Transport, Inc. (plaintiff's competitor in the transportation of the same cable reels to the missile base complex), conducted a one-day investigation of plaintiff's trucking of said cable reels to that complex, and at the direction of the North Dakota Public Service Commission.

9. Following said investigation, on May 29, 1963, the defendant Harold T. Upgren, at the direction of the North Dakota Public Service Commission, composed of the defendants Thompson, Hagen and Wolf, sent a letter to one Ets-Hokin and Galvan, Inc., (the contractor on the Minot missile base project responsible for the installation of the communication system and cable), copying the same to the plaintiff and to the defendant Ralph Wood, instructing the said Ets-Hokin and Galvan, Inc. that the movement of cable reels from plaintiff's North Dakota railheads to the missile site complex was intrastate commerce and could not legally be transported by the plaintiff inasmuch as plaintiff held no certificate of public convenience and necessity from that Commission. Both plaintiff and the said Ets-Hokin and Galvan, Inc. were advised in that letter that the North Dakota Commission was directing the defendant Ralph Wood, as

superintendent of the North Dakota State Highway Patrol, to take action under Section 49–18–44 of the North Dakota Century Code against the plaintiff for rendering this transportation service without a certificate of public convenience and necessity from the North Dakota Public Service Commission.

10. At no time preceding the aforesaid investigation of May 27, 1963, or the sending of the aforesaid letter of May 29, 1963, was plaintiff advised by the defendants of the complaints of Maas Transport, Inc. respecting the said movement of cable reels, nor was plaintiff advised by the defendants that the defendants were conducting an investigation into the transportation thereof as aforesaid, nor at any time was plaintiff afforded an opportunity to present evidence or to be heard respecting the said transportation of cable.

11. Chapter 28–32 of the N.D.C.C. is entitled and known as the "Administrative Agencies Practice Act".

Section 28–32–05, N.D.C.C. provides that:

"The following rules of procedure shall be observed by all administrative agencies in proceedings in which the same are applicable:

"1. In all proceedings brought before an administrative agency having jurisdiction of the subject matter, the petitioner, or the administrative agency when acting upon its own initiative, shall prepare and file a clear and concise statement or complaint with the agency having jurisdiction of said proceeding. Said complaint shall contain a concise statement of the claims or charges upon which the petitioner relies, and the relief sought. Upon the filing of such complaint, the appropriate administrative agency shall issue a notice for hearing, which shall fix the time and

place for trial thereof upon its merits. Said notice shall inform the party proceeded against that unless an answer to such complaint is served upon the petitioner and agency giving such notice at least three days before the time specified for hearing therein that the complaint will be deemed admitted, and that the agency will enter such order as the facts and law may warrant. A true copy of the complaint and notice of hearing shall be served upon the respondent personally, or by registered or certified mail, as the agency may direct, at least twenty days before the time specified for hearing thereof unless the service of such complaint or notice of hearing is waived, in writing, by the party proceeded against, or unless the parties agree upon a definite time and place for hearing thereof with the consent of the agency having jurisdiction. Provided, however, that in case of an emergency the agency, in its discretion, may notice a proceeding for hearing upon the merits upon less than twenty days' notice. Every party to such proceeding shall be given a reasonable time within which to prepare for such hearing, which may be extended by the agency upon good cause being shown by the applicant therefor.

"2. At such hearing, the person against whom the proceedings have been instituted shall be afforded the same opportunity to present evidence and to examine and cross-examine witnesses as is permitted to parties to an action in the district court."

Section 28–32–08, N.D.C.C. provides that:

"Whenever an administrative agency, pursuant to authority conferred upon it by law, shall institute an investigation upon its own motion or without the filing of a specified complaint, or shall hold any hearing or make any independent investigation upon the claim or request of any person, no decision shall be made by the agency until all parties in interest shall have been furnished with a written specification of the issues which are to be considered and determined, nor until an opportunity shall have been afforded to such parties to present evidence and to be heard upon the precise issues so specified. Provided, however, that the commissioners of the workmen's compensation bureau may make awards without the giving of the notice herein provided for."

12. On or about June 19, 1963, near Kenaston and Kenmare, North Dakota, one Walter Thompson, an officer of the North Dakota State Highway Patrol, acting at the direction of the defendant Ralph Wood, halted two of plaintiff's motor vehicles engaged in transporting shipments of cable reels to the missile site complex and warned the drivers thereof to discontinue using the roads of North Dakota without such intrastate certificate of public convenience and necessity.

13. On or about June 20, 1963, the said Walter Thompson halted one of plaintiff's motor vehicles engaged in transporting said reels of cable on the public highway between Kenaston and Mohall, North Dakota, and took the driver thereof into custody. After transporting the said driver into Kenmare, North Dakota, the said Walter Thompson released him without charge.

14. On June 21, 1963, at plaintiff's offices in Minot, North Dakota, one Sergeant Sibley, another officer of the defendant Ralph Wood's highway patrol, instructed plaintiff's agent and attorney that commencing the week of June 24, 1963, the drivers of any of plaintiff's ve-

hicles transporting reels of cable from plaintiff's railheads to the said missile base complex would be arrested and charged for operating without an intrastate certificate of public convenience and necessity.

15. The transportation of goods here involved is interstate commerce.

16. The defendants have threatened and attempted to enforce the statutory provisions herein quoted against the plaintiff in the matter of the commerce here involved and, unless restrained from so doing, will continue to attempt to enforce said provisions against the plaintiff.

17. Irreparable damage will result to plaintiff from the enforcement of said statutes by defendants.

18. Plaintiff has no adequate remedy at law.

### Memorandum

We will consider first the jurisdictional issue raised by defendants' motion to dismiss.

Plaintiff bases its allegation of jurisdiction upon Sections 2281 and 2284 of Title 28 U.S.C.A.

Section 2281 provides that:

"An interlocutory or permanent injunction restraining the enforcement, operation or execution of any State statute by restraining the action of any officer of such State in the enforcement or execution of such statute or of an order made by an administrative board or commission acting under State statutes, shall not be granted by any district court or judge thereof upon the ground of the unconstitutionality of such statute unless the application therefor is heard and determined by a district court of three judges under section 2284 of this title."

Section 2284 sets forth the procedure of convoking a three-judge district court.

▉ "* * * a substantial claim of unconstitutionality is necessary for the application * * *" of Section 2281. Ex parte Buder, 271 U.S. 461, 467, 46

S.Ct. 557, 559, 70 L.Ed. 1036. Also see: Louisville & Nashville Railroad Company v. Garrett et al., 231 U.S. 298, 304, 34 S.Ct. 48, 58 L.Ed. 229.

"The existence of a substantial question of constitutionality must be determined by the allegations of the bill of complaint." Ex parte Poresky, 290 U.S. 30, 32, 54 S.Ct. 3, 4, 5, 78 L.Ed. 152.

In its amended complaint the plaintiff alleges, among other things, that it is a common carrier by railroad engaged in interstate commerce; that, in the transportation and movement of the cable reels here involved from its railheads to the missile site complex, it was engaged in interstate commerce and operating under and pursuant to authority theretofore granted by the Interstate Commerce Commission; that such operations were interfered with, its motor vehicles therein engaged stopped, and drivers thereof taken into custody or threatened with arrest; and that such operations were ordered discontinued unless and until plaintiff secured from the Public Service Commission of the State of North Dakota a certificate of public convenience and necessity authorizing such operations.

Plaintiff further alleges that such conduct and course of action on the part of North Dakota officials were based upon a *de facto* order (in the form of a letter) issued by said Public Service Commission pursuant to Section 49–18–12, N.D.C.C., hereinbefore quoted in Finding of Fact No. 3. Appearing in such *de facto* order is the statement "The movement from the railhead to the sites is *intrastate* commerce and the service must be provided by intrastate carriers with proper operating authority from this Commission". (Emphasis ours.)

It is further alleged in the amended complaint that the North Dakota statutes involved herein "are unconstitutional in that they constitute a direct regulation of interstate commerce by the state of North Dakota contrary to Article 1, Section 8, Clause 3, of the federal constitution", and that the action of the defendants complained of, taken under color of the authority conferred upon them

by said statutes, " * * * is an unlawful and unconstitutional interference with, and obstruction of, interstate commerce licensed and authorized by the Interstate Commerce Commission pursuant to Section 210a(a) of the Interstate Commerce Act * * *".

"The jurisdiction of the three-judge court rests on a substantial claim that the statute, if applicable, is unconstitutional. That it is determined, after final submission and upon consideration of the briefs and argument, that the statute does not apply, and the constitutional question otherwise presented should not therefore be ruled, does not oust the three-judge court of jurisdiction." Modern Woodmen of America v. Casados et al., D.C., 15 F.Supp. 483, 486.

■ In our opinion a substantial question of constitutionality does exist, upon the allegations of the amended complaint. Whether the plaintiff is entitled to any relief on the merits of this controversy can only be determined by this Court's taking jurisdiction of the case.

"Whether an objection that a bill or a complaint fails to state a case under a federal statute raises a question of jurisdiction or of merits is to be determined by the application of a well settled rule. If the bill or the complaint sets forth a substantial claim, a case is presented within the federal jurisdiction, however the court, upon consideration, may decide as to the legal sufficiency of the facts alleged to support the claim." Levering & Garrigues Co. et al. v. Morrin et al., 289 U.S. 103, 105, 53 S.Ct. 549, 550, 77 L.Ed. 1062.

Also see: Mosher v. City of Phoenix, 287 U.S. 29, 53 S.Ct. 67, 77 L.Ed. 148.

We believe this conclusion is fortified by the stipulation herein referred to, made by counsel for defendants, that, for the purpose of determining and ruling on their motion to dismiss, this Court could consider the transportation here involved as being interstate commerce.

Based upon the foregoing, it is our conclusion that defendant's motion to dismiss must be, and is, denied.

## I.

Turning now to the merits of the case, we are initially faced with the problem of determining the character of the shipments involved.

Defendants, of course, contend that the commerce which they seek to regulate is in fact intrastate in character and therefore subject to the regulation and supervision of the Public Service Commission of the State of North Dakota, and subject to the North Dakota statutes hereinbefore referred to.

The shipments involved in this litigation consist of electrical cable manufactured at Bonham, Texas, for ultimate installation in the missile complex communication system linking launch control centers to missile silos. Each shipment is made by the manufacturer by rail from Bonham, Texas, to the cable installer at one of several rail-truck transloading points located within the missile complex. Such points are located at Kenaston, Palermo and Mohall, all of which are in the general area of Minot, North Dakota.

At the transloading point, the shipment is unloaded from the rail car by use of a forklift truck which is leased by the plaintiff for this specific purpose and operated by its own employees. If the cable were to arrive in sequence in the order in which it were to be installed, it would be transloaded directly from the rail car to one of plaintiff's flat-bed trucks and delivered directly to the installation site. However, the manufacturer is usually unable to ship the reels of cable in sequence. As a consequence (and for this sole reason) a shipment consisting of a portion of a line may be received at the railhead on one day and another portion of the same line a few days later. Hence, the reels of cable arriving at the railhead must be unloaded from the rail car and stored for a varying period of time on property owned by the plaintiff, adjacent to the railroad track, until such time that a complete line can be delivered to the installation site. When the installer (consignee) is ready for a particular line installation

(and the units making up such line are available at the railhead) he directs plaintiff to load the cable reels onto trucks for movement to the place of installation. Such movement is done under separate motor carrier billings. The equipment used in the transportation from railhead to installation site is owned by the plaintiff, operated by its employees, and specially equipped for such purpose.

Prior to shipping the reels of cable from Bonham, Texas, the manufacturer, at the request of the consignee (and only for the latter's convenience), affixes to each reel a series of numbers with a letter prefix. A description of the missile complex is necessary for an understanding of the significance of such designation.

The missile complex, called a wing of three squadrons, is composed of 150 individual missile silos and 15 launch control centers. There are 15 separate flights in the complex, each of which is composed of 10 missile silos and 1 launch control center. Each of the 15 flights is given a letter designation such as A, B, C, D, etc. The launch control center in flight J, for example, is designated J–1 and the 10 individual sites in flight J are designated J–2 through J–11, inclusive. The launch control center is approximately at the geographical center of its flight with the missile sites in that flight ringed around it at various distances.

The cable is strung from the launch control center to the sites in a particular flight and between sites in that flight, forming a spoked wheel configuration.

The letter designation on the cable when it leaves the origin point at Bonham designates the particular flight to which that cable reel will be sent. Thus, if the cable reel bears designation J., for example, it consists of cable to be installed in flight J rather than in any of the other flights. There is never any substitution of flight J cable for cable labelled for another flight because the cable on each reel is of a particular make-up (called configuration) so that it can

only be used in that particular flight. Configuration refers to the number and thickness of the wires comprising a particular segment of cable. Also the cable is ordered by the contractor-installer in particular lengths designed to fit the geography of a particular flight. This ordering of cable by particular lengths is done by a cable call from the contractor-installer to the General Cable Company.

The first two numbers following the flight designation letter on a reel of cable indicate the line in that particular flight between launch control center and site, or from site to site, as the case may be, on which the particular reel will be strung. Again there is no substitution of cable marked for a particular line in a flight with cable marked for another line in the same flight, because of the configuration of the cable and its particular length.

The last number on a particular reel of cable designates the point on the line in a particular flight where that particular reel will be strung. It is possible to change the point on a particular line in a particular flight where the cable will be strung, but as a practical matter it has usually not been done.

The carrier is furnished a "spotting sheet" by Ets-Hokin & Galvan, Inc., which translates the number on the reel into junction numbers designated on stakes in the field at which a particular reel is to be delivered. When the consignee is ready to install a particular reel, he instructs the carrier of the line where he is working and the cable is shipped by truck to the point of installation.

The selection of the transloading point by the manufacturer is based upon the proximity of the railhead to the installation site within the complex for which the cable making up that particular shipment was designed.

The Interstate Commerce Act (49 U.S. C.A. § 303(a) (10)) defines the term "interstate commerce" as follows:

"The term 'interstate commerce' means commerce between any place

in a State and any place in another State or between places in the same State through another State, whether such commerce moves wholly by motor vehicle or partly by motor vehicle and partly by rail, express, or water * * *."

■ The general principle for application in determining the character of the commerce involved herein is well stated by the Supreme Court of South Dakota in Buckingham Transportation Co. of Colorado, Inc. v. Black Hills Transportation Co. et al., 66 S.D. 230, 281 N.W. 94, 95, as follows:

"The essential character of transportation classifies it either as interstate or intrastate. It is the intention formed prior to shipment, pursuant to which property is carried to a selected destination by a continuous or unified movement, which fixes its essential character. When the intention which produces the movement is known, the incidents of the transportation become insignificant and need not be considered in determining whether the transportation is of the one order or the other." (Cases cited.)

While defendants apparently have no quarrel with the principle stated in Buckingham, they contend there is no specific, direct testimony concerning the intention of the shipper, stress the fact that the bills of lading indicate the railroad as being the "final destination", contend that the responsibility of the manufacturer-shipper ceases upon delivery of the goods at the railhead, and conclude that the movement of the cable from the railhead to the installation site under a motor carrier billing constitutes an independent and separate contract intrastate in character.

In substance, most of the contentions and arguments advanced by defendants herein were raised by the defendant shipper in Baltimore & Ohio Southwestern Railroad Company v. Settle et al., 260 U.S. 166, at page 170, 43 S.Ct. 28, at page 30, 67 L.Ed. 189, wherein the Court stated:

"That the contract between shipper and carrier does not necessarily determine the character was settled by a series of cases in which the subject received much consideration." (Cases cited.)

and further, 260 U.S. at page 171, 43 S. Ct. at pages 30–31, 67 L.Ed. 189:

"For neither through billing, uninterrupted movement, continuous possession by the carrier, nor unbroken bulk, is an essential of a through interstate shipment."

The Supreme Court of the United States, in Western Oil Refining Company v. Lipscomb, 244 U.S. 346, at page 349, 37 S.Ct. 623, at page 624, 61 L.Ed. 1181, stated that:

"Ordinarily the question whether particular commerce is interstate or intrastate is determined by what is actually done and not by any mere billing or plurality of carriers, and where commodities are in fact destined from one State to another a rebilling or reshipment en route does not of itself break the continuity of the movement or require that any part be classified differently from the remainder. As this court often has said, it is the essential character of the commerce, not the accident of local or through bills of lading, that is decisive." (Cases cited.)

■ We therefore conclude that the fact the commerce here involved was covered and transported by separate rail and motor carrier billings does not control our determination of the essential character of such commerce.

■ Defendants further contend that the custody and responsibility of the shipments are transferred from the manufacturer-consignor to the installer-consignee at the transloading point where the installer-consignee may inspect and, for cause, reject the cable, and that by virtue of such transfer and right to inspection and rejection, the subsequent movement by motor carrier is distinct and independent from the rail movement. Similar contentions have been raised in

numerous other cases and uniformly rejected by the courts.

In Powell et al. v. United States, (4 Cir.) 112 F.2d 764, at pages 765 and 766, the court said:

"There can be no question but that this evidence was sufficient to sustain a finding by the court that the shipment from Goldsboro to Wilmington was but a step in the transportation of the scrap iron to its real and ultimate destination in a foreign country. The case is not one of shipment to a point of collection or distribution, where the original movement comes to an end and further transportation depends upon sale or other circumstance. The journey in foreign commerce had commenced, and the mere fact that transfer of title at the port was contemplated and that inspection with right of rejection was provided for, did not change its essential character. Directly in point, we think, is the case of Texas & N. O. R. Co. v. Sabine Tram Co., 227 U.S. 111, 33 S.Ct. 229, 234, 57 L.Ed. 442, a case involving a shipment of lumber from an inland point in Texas to the port of Sabine, Texas, for export. In holding that the fact that a foreign destination was intended at the time of shipment was determinative, and that the character of the shipment as being one in foreign commerce was not affected by the fact that it was shipped to the exporter under an order notify bill of lading or that the original shipper had no further control over it after its arrival at the port of Sabine, the court said: 'It is said, however, that the Sabine Company had no connection with the lumber after its arrival at Sabine, and had no concern with its destination after it came into the hands of Powell Company, and had no particular knowledge thereof. Like circumstances undoubtedly existed in Southern Pacific Terminal Co. v. Interstate Commerce Commission (219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310). It did not prevail there and cannot prevail here. The determining circumstance is that the shipment of the lumber to Sabine was but a step in its transportation to its real and ultimate destination in foreign countries. In other words, the essential character of the commerce, not its mere accidents, should determine.'"

Also see: Peoples Natural Gas Company v. Public Service Commission of Pennsylvania et al., 270 U.S. 550, 46 S.Ct. 371, 70 L.Ed. 726; Public Utilities Commission of Rhode Island et al. v. Attleboro Steam & Electric Company, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549; Atlantic Coast Line Railroad Company v. Standard Oil Company of Kentucky, 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270; and United States et al. v. Erie Railroad Company et al., 280 U.S. 98, 50 S.Ct. 51, 74 L.Ed. 187.

Defendants also stress the temporary stoppage of the overall movement at the railheads (transloading points)—the unloading, storage and reloading onto motor carriers of the cable reels prior to completion of delivery—in determining the character of the commerce. This aspect of the case also has received the consideration of numerous courts.

The Court of Appeals for the Fifth Circuit, in State of Texas v. Anderson, Clayton & Co. et al., 92 F.2d 104, at page 107, stated:

"It is well settled that, in determining whether a particular movement of freight is interstate or intrastate or foreign commerce, the intention existing at the time the movement starts governs and fixes the character of the shipment. If the shipment comes to rest within the state of origin and the goods are thereafter disposed of locally, the interstate character of the shipment is lost, but temporary stoppage within the state, made necessary in furtherance of the interstate carriage, does not change its character."

For an excellent discussion of the principle of "continuity of journey", see the

opinion of Mr. Chief Justice Taft in Carson Petroleum Company v. Vial et al., 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626.

■ We believe the application of the principles hereinbefore discussed to the circumstances existing in this case can reasonably result in only one conclusion. Each reel of cable was manufactured to serve a specific purpose in a predestined segment of the missile complex. Prior to shipment a coded designation was stenciled on each reel by the manufacturer-shipper for the purpose of identifying its exact installation site within the missile complex. The entire movement, from Bonham, Texas, to installation site, was under the control of one carrier, plaintiff herein. Upon arrival at the railhead-transloading point, the reels of cable were removed from the rail freight cars by plaintiff's employees and temporarily stored adjacent to the track spur on property owned by plaintiff. Subsequently said cable reels were loaded onto plaintiff's motor vehicles by its own employees and transported to the predesignated installation sites. The railhead itself had been previously selected solely for the speedy, convenient and continuous movement of the shipment to its ultimate destination.

We are convinced that the temporary delay and transshipment at the railhead did not cause a break, in the sense of the Interstate Commerce Act, in the continuity of such transportation. We are equally convinced that the continuity of transit was not affected by the change in responsibility or control of the shipment at the railhead (insofar as the consignee was vested with the right of inspection and rejection of the shipment) or by the separate motor carrier billing for the movement from the railhead to the ultimate installation site.

We are of the opinion that the rail transportation and the movement by truck of the cable reels involved in this case " * * * in fact and in legal contemplation were connected parts of a continuing interstate movement * * * ". Western Oil Refining Company v. Lips-

comb, supra, 244 U.S. at page 350, 37 S. Ct. at page 625, 61 L.Ed. 1181.

## II.

■ Defendants contend that the plaintiff has failed to prove it has suffered, or will in the future suffer, irreparable injury as a result of defendants' actions, and argue that an adequate remedy exists in the state courts for any purported wrongs done the plaintiff.

In our opinion the evidence conclusively establishes the contrary. Actions taken by the defendants, or threatened by them, directly affect both the business operations of the plaintiff and its rights under its I.C.C. permit, and infringes personal, constitutional rights of plaintiff's drivers. Such action includes the stopping of trucks engaged in the transportation of interstate commerce vital to the defense of the United States. Such action has the effect of nullifying the rights of the plaintiffs granted it by its federal permit, and of illegally preventing such commerce unless and until it should secure a certificate of necessity and convenience from the Public Service Commission of the State of North Dakota. In effect such action prevents plaintiff from earning and collecting its charges for transporting the goods involved in this action according to its contract. Further, it arbitrarily and without legal authority causes the idling of equipment owned by plaintiff and especially equipped by it at substantial expense for the performance of its contract of conveyance, and causes the formal arrest and prosecution of plaintiff's drivers engaged in the trucking operation. In Andrew G. Nelson, Inc. v. Jessup et al., D.C. 1955, 134 F.Supp. 221, at page 229, the court stated:

"While the plaintiff, upon hearing, failed to establish that it has sustained extensive damages notwithstanding the number of arrests of its drivers, yet the threat of irreparable injury is implicit in the defendants' joint answer wherein it is averred that defendants intend to cause

further arrests of plaintiff's drivers in this situation. The testimony offered by the defendants further emphasizes this threat. Nor does plaintiff have an adequate remedy at law."

We hold that the actions on the part of defendants hereinabove described have and will in the future cause irreparable damage to the plaintiff.

### III.

Counsel for defendants suggests that plaintiff has several adequate remedies available to it in the North Dakota courts. He contends that each of plaintiff's drivers who may be arrested should defend himself in the criminal action and, if convicted, appeal to the North Dakota Supreme Court. The suggestion is further made that it would be "presumed" that the Public Service Commission would, in any civil proceedings had in state court, feel bound by the determination of the Supreme Court of North Dakota in any such criminal action. Of course, the inadequacy and total ineffectiveness of such suggested remedy is obvious.

As another remedy, it is suggested that plaintiff institute an action in the courts of North Dakota for the purpose of setting aside the purported "order" (letter of May 29, 1963, over signature of Mr. Upgren) of the Public Service Commission. Defendants' counsel argues that said letter is not an administrative order within the meaning of the Interstate Commerce Act, but that, if construed as an order of the Public Service Commission, it is null and void because, in causing its issuance, said Commission failed to adhere to the statutory procedural requirements. (Section 28–32–05, N.D. C.C.) See: State of North Dakota ex rel. Public Service Commission v. Northern Pacific Railway Company et al., N.D., 75 N.W.2d 129, and Lyons v. Otter Tail Power Co., 68 N.D. 403, 280 N.W. 192.

Again, that such action on the part of plaintiff would not constitute an adequate remedy is obvious, in view of the urgency of the determination of the rights of the respective parties hereto, of the im-

minence of the completion of the missile complex involved, and of the expense and delay of such proposed action.

As we understand it, defendants further contend that, inasmuch as the May 29 letter is not an "order", but merely a letter which is not legally binding upon anyone, including the North Dakota Highway Patrol—an independent state agency—that perhaps the members of said Highway Patrol will not arrest plaintiff's drivers or interfere with them in any way, but will disregard the directives contained in said letter and that plaintiff therefore needs no remedy for such threatened actions either in this Court or in any other court. We are not persuaded by this approach, which to us appears completely unrealistic. The letter states in part:

"Upon investigation by the Commission, it has been found that the Great Northern Railway Company is providing service for the transportation of cable reels from various railheads to sites where trenches are being dug by the Hood Corporation. The movement from the railhead to the sites is intrastate commerce and the service must be provided by intrastate carriers with proper authority from this Commission.

"A copy of this letter is being forwarded to Superintendent Ralph Wood of the North Dakota Highway Patrol, who enforce the laws, rules and regulations of this Commission, advising him that said transportation service being provided by the Great Northern Railway Company and the Hood Corporation is illegal transportation and that action should be taken immediately in accordance to statute 49–18–44 of the North Dakota Century Code."

One of the obvious purposes of such letter, and a necessary effect thereof, was to convey to the Superintendent of the North Dakota Highway Patrol a representation that there had been an investigation by the Commission (which investigation said Superintendent had a right

to assume was in accordance with the statutory provisions), that there had been a finding by the Commission that the commerce involved was intrastate in nature, that such service could legally be provided only by carriers operating with proper authority from said Commission, and he (the Superintendent) was thereby advised that such movements by the plaintiff in the absence of such authority were and would be illegal, and that the North Dakota Highway Patrol had and have the duty of enforcing the applicable provisions of law.

Defendants further suggest the right of plaintiff to appeal from the "order" of May 29, if it is to be construed as such. Whether or not such an "order" is appealable under the provisions of Section 28–32–15, N.D.C.C. (the statute providing for appeal from certain decisions in any proceeding heard by an administrative agency) need not be determined by us. If appealable, such an appeal would be to a district court of this state, and Section 28–32–20, N.D.C.C. provides that such an appeal does not stay the proceedings unless the court to which the appeal is taken shall so order. Section 28–32–21, N.D.C.C. provides for a review of the district court decision in the Supreme Court of North Dakota. That such procedure is not an adequate remedy is obvious for all of the reasons heretofore stated, and for the further reason that, in the absence of an order staying proceedings during such an appeal, the "order" could and undoubtedly would be enforced by the continuing arrests of plaintiff's drivers engaged in interstate commerce.

### IV.

The sole question remaining concerns the relief to be granted plaintiff by this Court.

In Dohrn Transfer Co. v. Hoegh, D.C. Iowa, 116 F.Supp. 177, at page 189 thereof, the court said:

"It is clear that under the situation shown in this case the Iowa Commerce Commission may not properly

and legally enforce the provisions of Section 325.6 as against the plaintiff; the commerce clause is an impediment to it so doing. It is clear that attempts on the part of the commission to so do would cause irreparable injury to the plaintiff. However, such a holding under the facts in this case does not necessarily require a holding that the statute is unconstitutional. The plaintiff in this action is a champion of no one's rights except its own. In the case of Spector Motor Service, Inc., v. McLaughlin, 1944, 323 U.S. 101, at page 105, 65 S.Ct. 152, at page 154, 89 L.Ed. 101, the United States Supreme Court stated in regard to the matter of questions involving the constitutionality of state statutes:

"'If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality * * * unless such adjudication is unavoidable. * * *'

In the case of State ex rel. Board of Railroad Commissioners v. Martin, supra, the Iowa Supreme Court stated, [210 Iowa 207] 230 N.W. [540] at pages 543, 544:

"'* * * It is not to be presumed that the Legislature intended to invade the field in which the federal government has exclusive jurisdiction, * * *'

In the same case the same Court stated, 230 N.W. at page 543:

"'* * * The commerce clause may operate to limit the applicability of some of the * * * provisions of the statute * * *'."

That the federal government has exclusive authority to regulate interstate commerce, and that any attempt to regulate such commerce by the state or under its authority is void, is conceded by defendants. Evidence that the North Dakota Legislature did not intend that the state statutes complained of should be appli-

cable to commerce within the exclusive jurisdiction of the federal government is found in the limiting provision of Chapter 49, N.D.C.C., Section 49–18–05, which provides that:

"This chapter shall apply to persons and motor vehicles engaged in interstate commerce only to the extent permitted by the constitution and laws of the United States."

The provision of North Dakota law above quoted is similar, in effect, to that of an Indiana statute considered in Andrew G. Nelson, Inc. v. Jessup, D.C.Ind., 134 F.Supp. 218. The Court in that case, 134 F.Supp. at page 229, said:

"There is no need for the Court to deal with the question of the constitutionality of Section 47–1221, Burns Ind.Stats.Ann., particularly in view of the provisions of Section 47–1235, Burns Ind.Stats.Ann. With respect to interstate commerce, the latter section provides:

" 'The provisions of this act (§§ 47–1211—47–1250) shall apply alike to persons engaged in the transportation of persons or property over the highways of the state of Indiana whether such transportation be interstate or intrastate, except in so far as this act may contravene the Constitution or the laws of the United States. (Acts 1935, ch. 287, § 25, p. 1412.)'

The Court merely holds that Section 47–1221, supra, is inapplicable to the plaintiff to the extent that it would authorize the actions complained of."

It is our opinion that the provisions of Sections 18–07, 18–12, 18–44 and 18–45, Chapter 49, N.D.C.C. are not applicable to the plaintiff herein and may not be legally enforced against it, and that it is unnecessary for this Court to decide the question of the constitutionality of said sections, or of any thereof. A permanent injunction against the defendants as prayed for in the amended complaint will be an adequate remedy for the protection of the plaintiff's rights.

*Conclusions of Law*

1. This Court has jurisdiction of the subject matter of this action and of the parties thereto.

2. No determination need be, or should be, made as to the constitutionality of any one or more of the North Dakota statutes here under attack.

3. Plaintiff is entitled to an order for permanent injunctive relief against all defendants as prayed for in the amended complaint.

Counsel for plaintiff will promptly prepare and submit to this Court a form of injunctive order in conformity herewith.

It is so ordered.